IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |
|---|---|---|
| AMERITOX, LTD., | * | |
| Plaintiff, | * | |
| v. | * | CIVIL NO.: WDQ-15-499 |
| ROBERT SAVELICH, | * | |
| Defendant. | * | |
|  | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

Ameritox, Ltd. ("Ameritox")[1] sued Robert Savelich for breach
of contract and other claims. ECF No. 1.[2] On February 25, 2015,
the Court granted Ameritox's motion for a temporary restraining
order ("TRO"). ECF No. 12.[3]  On March 9, 2015, the Court held

---

[1] Ameritox provides specimen-testing and behavioral health
monitoring services to healthcare providers nationwide. ECF No.
9-3 at 6. These services (which include urine testing) help
clinicians provide care to patients with chronic pain or serious
mental illness. ECF No. 1 at 3. To assist its sales force,
Ameritox "develops significant confidential and proprietary
information and trade secrets . . ., including customer
information and training materials." ECF No. 9-3 at 7.
Ameritox's industry is "extremely competitive." ECF No. 1 at 4.

[2] Count One alleges breach of contract; Count Two alleges
misappropriation of trade secrets, in violation of Md. Code
Ann., Com. Law §§ 11-201, et seq.; and Count Three alleges
breach of duty of loyalty. ECF No. 1 at 9-11.

[3] The Court has diversity jurisdiction under 28 U.S.C. § 1332,
which provides for "original jurisdiction of all civil actions
where the matter in controversy exceeds the sum or value of
$75,000, exclusive of interest and costs, and is between . . .
citizens of different States." Ameritox has its headquarters
and principal place of business in Baltimore, Maryland; Savelich
appears to be a citizen of Oregon. ECF No. 1 ¶ 6. Taking into
account damages and the value of the injunctive relief Ameritox

a preliminary injunction hearing.  ECF No. 19.[4]  For the

following reasons Ameritox's motion for a preliminary injunction

will be denied.[5]

I.   Background

From April 16, 2010 to January 2015, Savelich worked for

Ameritox as a District Manager responsible for the Northwest

district.  ECF No. 9-5 ("Hopkins Decl.") ¶¶ 6, 12.[6]  On April 12,

2010, Savelich signed a Confidentiality[7] and Noncompetition[8]

---

seeks, more than $75,000 is in controversy.  *Id.* ¶¶ 6, 64, 68;
*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347
(1977); *JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 639 (4th Cir.
2010).  Additionally, one of the contracts at issue contained a
forum selection clause, in which Savelich "irrevocably and
unconditionally" agreed that suits arising out of that contract
may be brought in federal court in Maryland, consented to the
jurisdiction of Maryland courts, and waived any objection to
venue.  *See* Hopkins Decl., Ex. 2 ¶ 7; *CoStar Realty Info., Inc.
v. Meissner*, 604 F. Supp. 2d 757, 772 (D. Md. 2009).

[4] On March 6, 2015, Ameritox filed an additional motion for a
preliminary injunction, ECF No. 24.

[5] Additionally, the Court will grant Ameritox's and Savelich's
emergency motions to seal and for an extension of time.  ECF
Nos. 26, 27.

[6] Savelich worked out of his home office.  Hr'g Tr. at 27.  He
was responsible for marketing and selling "toxicology by urine
and oral fluid, and genetics" ("toxicology services").  ECF No.
28-1 ("Savelich Decl.") ¶ 15.  Customers of toxicology services
included "physicians, pain treatment centers[,] and other
patient-care facilities."  *Id.*  He provided services to Ameritox
clients in Washington, Oregon, California, Wyoming, Montana,
Utah, Idaho, Colorado, New Mexico, Arizona, and Texas.  Tully
Decl. ¶ 21.

[7] The Agreement provided that Savelich would have access to
"Confidential Information," defined as, "without limitation,

Agreement ("Agreement").[9]  *Id*. ¶ 7; Hopkins Ex. 2.[10]  On April

13, 2010 Savelich signed an Employee Agreement on Inventions,

---

information and knowledge pertaining to services offered,
innovations, ideas, plans, trade secrets, proprietary
information, marketing and sales methods and systems, sales and
profit figures, customer and client lists, Ameritox employee
lists, and relationships between Ameritox and its affiliates and
other customers, clients, suppliers, and others. . . ."  Hopkins
Ex. 2 ¶ 3 ("confidentiality covenant").  Savelich agreed not to
"disclose," "use or exploit in any manner," or "remove . . .
from the possession and control of Ameritox" any Confidential
Information.  *Id*.

[8] The noncompetition provision provided that, for one year after
the date that Savelich's employment with Ameritox ended, he
would not:

> (i) directly or indirectly solicit, entice or induce
> any client of Ameritox within the states of AZ, CA,
> CO, ID, MI, NM, NV, OK, OR, TX, UT, WA, WY which are
> states within my purview . . . , to become a client,
> customer, distributor, licensor, licensee or reseller
> of any other person, firm or corporation other than
> Ameritox with respect to products and/or services then
> sold or under development by Ameritox or to reduce or
> cease doing business with Ameritox, *nor shall I*,
> directly or indirectly, provide services to such
> client on behalf of any entity other than Ameritox . .
> . .; [or] (ii) directly or indirectly solicit, recruit
> or hire any employee of Ameritox (including any
> employee who were (*sic*) no longer employees of
> Ameritox within six (6) months of such solicitation)
> to work for a third party other than Ameritox or
> engage in any activity that would cause any employee
> to violate any agreement with Ameritox . . . .

Hopkins Ex. 2 ¶ 2 (emphasis added).  Paragraph 2 of the
Agreement--the noncompete provision--effectively contained three
covenants: customer nonsolicitation, a noncompete, and employee
nonsolicitation.  *Id*.  Ameritox is not seeking to enforce the
noncompete covenant.  Hr'g Tr. at 3.

[9] On June 1, 2010, Savelich signed an amended Agreement that
corrected his job title.  Hopkins Decl. ¶ 10.

Improvements, Copyright, and Trade Secrets ("Trade Secrets Agreement"),[11] and an Employee Confidentiality and HIPAA Privacy Agreement ("HIPAA Agreement").[12]  *Id*. ¶¶ 8, 9; Hopkins Ex's. 3, 4.[13]  All agreements were signed by Savelich at his Oregon home. Savelich Decl. ¶ 10.

On December 19, 2014, Savelich informed James Tully, Ameritox Regional Manager, that he would be resigning from Ameritox to work for Ameritox's competitor, Physicians Choice Laboratory Services ("PCLS").  ECF No. 10-4 (Tully Decl.) ¶ 25; Tully Ex. 1 (Savelich resignation email).  Savelich told Tully that he did not think the Agreement would present any issues

---

[10] For ease of reference, exhibits will be cited in accordance with the declaration to which they were attached.

[11] Savelich agreed to guard, not disclose, or use for his or a third-party's benefit, Ameritox's trade secrets and confidential information, and agreed not to remove "any records containing confidential information."  Hopkins Ex. 3 ¶¶ 2-3.  The Trade Secrets Agreement does not define "confidential information." *Id*. at 1.

[12] The HIPAA Agreement also barred Savelich from disclosing or removing Confidential Information.  Hopkins Ex. 4 ¶¶ 6, 10.  The HIPAA Agreement defines "confidential information" as including, but not limited to, "[protected health information], financial information, business data or information, customer information, reports, pricing information, projections, employee lists and personnel information, records, notes, analyses, studies[,] or other information related in any manner to the operations of the Company."  Hopkins Ex. 4 at 1.

[13] Savelich's signed Offer Letter also contained customer and employee non-solicitation covenants identical to those in the Agreement.  Hopkins Ex. 1.  Savelich signed the offer letter on April 12, 2010, the same day he received it from Ameritox by email.  Savelich Decl. ¶ 8.

because PCLS focuses on different product lines, although Savelich would be responsible for Washington, Oregon, and other western states.  Tully Decl. ¶¶ 26-27.[14]

In February 2015, upon learning that a PCLS recruiter had solicited an Ameritox employee, and had mentioned its successful recruitment of Savelich, Ameritox reviewed Savelich's Ameritox email account.  *Id.* ¶¶ 29-30; *see also* ECF No. 9-6 ("Carr Decl.") (describing the efforts of Eric Carr, Network, Security and Compliance Manager, to search for emails from Savelich's work account to external accounts).  Ameritox learned that, on December 23, 2014, and December 29, 2014, Savelich had sent several emails from his work account to his personal account,[15] to which he allegedly attached Confidential Information.[16]  They include:

- A December 23, 2014 email with the subject line "IMS.7z," to which Savelich attached a spreadsheet containing data

---

[14] PCLS offers services similar to Ameritox's toxicology services, and services, such as "cancer biomarkers," "gynecology cytology," and "healthcare associated infections," that are not offered by Ameritox.  Savelich Decl. ¶ 21.

[15] One of the emails Ameritox found was Savelich's employment eligibility verification, prepared on December 23, 2014 for PCLS, which stated his personal email address as rsavelich@yahoo.com.  Tully Ex. 2.

[16] *See* ECF No. 25-5 at 30(Savelich's answers to Ameritox's second set of interrogatories, wherein Savelich refers to Ameritox's response to Savelich's Interrogatory No. 5, that Ameritox considers the listed documents confidential).

on about 35,000 healthcare providers in Savelich's
region.  ECF No. 20 ("Field Decl.") ¶ 5; Field Ex.'s A,
A-1; Tully Decl. ¶ 32(a).[17]  Those providers are
Ameritox's past, present, and potential customers.  Tully
Decl. ¶ 32(a).  Ameritox purchased the health provider
information from IMS Health ("IMS").  Tully Decl. ¶ 9.
Savelich also attached customer lists from Ameritox's
proprietary "Territory Management Tool" ("TMT").  Field
Decl. ¶ 5(b); Field Ex. A-2; Tully Decl. ¶¶ 11, 32(b).

- A December 23, 2014 email with the subject line "Business
  Plans and Pipelines.7z," to which Savelich attached
  account data for certain Ameritox customers, and notes on
  customers Ameritox had been targeting.  Field Decl. ¶ 6;
  Field Ex.'s B, B-1, B-2; Tully Decl. ¶ 32(d),(e).

- A December 23, 2014 email with the subject line "Jan 2013
  one day meeting.7z," to which Savelich attached
  Ameritox's compensation rates for various services.
  Field Decl. ¶ 9; Field Ex.'s E, E-1; Tully Decl. ¶ 32(e).

- A December 29, 2014 email with the subject line
  "Emailing: Interview Guide," to which Savelich attached
  Ameritox's "Basic Interview Guide: Version 1.3."  Field
  Decl. ¶ 10; Field Ex.'s F, F-1.  The Interview Guide

---

[17] Ameritox's customer information was password-protected and
stored on Ameritox's network.  Hr'g Tr. at 6.

"contains customizable questions, checklists, [and] sample questions" designed "to help recruit sales employees best suited to implement Ameritox's sales strategies."  Field Ex. F-1 at 1; Tully Decl. ¶ 32(g).

- A December 29, 2014 email with the subject line "AAA New Business Development.7z."  Field Ex. C.  Savelich attached several spreadsheets containing information on Ameritox customers' account type, account name, anticipated volume per month, and notes about the customers' accounts.  Field Decl. ¶ 7(a); Field Ex. C-1; Tully Decl. ¶ 32(c).  Savelich also attached information on Ameritox business targets in his region.  Field Decl. ¶ 7(b); Field Ex. C-2; Tully Decl. ¶ 32(h).

- A December 29, 2014 email with the subject line "Roberto.7z," to which he attached Ameritox's confidential "Financial Practice Profile" prepared for the State of Oregon.  Field Decl. ¶ 8(a); Field Ex.'s D. D-1.  Savelich also attached a lengthy PowerPoint presentation titled "A Proposal for a Comprehensive Approach to Chronic Opioid Management," which Ameritox had prepared for Aetna.  Field. Ex. D-2.  Ameritox had developed the PowerPoint as part of its "efforts to expand its business with major health insurance providers."  Tully Decl. ¶ 32(f).

On February 23, 2015, Ameritox sued Savelich for breach of contract, misappropriation of trade secrets, and breach of duty of loyalty.  ECF No. 1.  That day, Ameritox moved for a TRO and preliminary injunction barring Savelich from, among other things, soliciting or attempting to solicit Ameritox customers or employees, or using or disclosing Ameritox's documents, information, or data.  ECF Nos. 8, 10 (amended).  On February 25, 2015, the Court granted the TRO.  ECF No. 12.  On February 26, 2015, the Court granted in part and denied in part Ameritox's motion to expedite discovery.  ECF No. 17.[18]

On March 3, 2015, Savelich began producing electronic information, and has returned about 370 pages of hard copy documents to Ameritox, including those listed above.  ECF Nos. 24-1 at 8 n.4; 24-3 ("Supp. Field Decl.") ¶ 4.[19]  On March 4,

---

[18] The Court granted Ameritox's request to serve expedited requests for production of documents and interrogatories.  ECF No. 17 at 6-7.  As of Friday, March 06, 2015, the parties have begun, but have not completed, the production of information.  ECF No. 24-1 at 13.  Ameritox has not had the opportunity to conduct a forensic inspection of Savelich's computer devices.  *Id.*

[19] At the hearing, Savelich explained that he had returned all hard copies of Ameritox documents that had been in his home office from his five years of employment with the company.  Hr'g Tr. at 27.  Savelich has also taken steps to preserve and return electronic information.  *Id.* at 27-28; *see also* ECF No. 28-1 (Declaration of Philip A. Rodokanakis, managing director of U.S. Data Forensics ["Rodokanakis Decl."]).  Working with Ameritox consultants, Rodokanakis collected and preserved information and data in Savelich's email accounts.  Rodokanakis Decl. ¶¶ 9-17.  Rodokanakis also ran various search terms suggested by Ameritox

2015, Savelich produced additional documents, including his PCLS

offer letter,[20] emails between Savelich and PCLS,[21]  and answers

to interrogatories.  Supp. Field Decl. ¶¶ 5-10.

---

and returned to the company responsive emails and attachments.
*Id.* ¶¶ 24-25.  Rodokanakis also began remotely imaging
information in Savelich's personal iPhone and desktop computer;
that information was then copied onto a hard drive and provided
to Ameritox consultants.  Hr'g Tr. at 29.  Because of inclement
weather, Rodokanakis was unable to complete remote imaging of
Savelich's PCLS devices before the preliminary injunction
hearing.  *Id.*  When remote images have been captured from all of
Savelich's devices, Rodokanakis will run searches using
Ameritox's search terms to find responsive data to return to
Ameritox.  *Id.*  Finally, all information returned to Ameritox
will be deleted from Savelich's email accounts and devices.  *Id.*
at 30.  Savelich anticipates completing the remote imaging and
deletion process before the TRO expires.  *Id.*

[20] The offer letter states that PCLS provides "LCMS Testing" and
"Pharmacogenetic testing," which are also services provided by
Ameritox.  ECF No. 24-13 ("Supp. Tully Decl.") ¶ 4; Supp. Field
Ex. B at 1.  The offer letter further barred Savelich from
"sharing with PCLS . . . any trade secrets or confidential
information of any former employers."  Supp. Field Ex. B at 18.

[21] On December 18, 2014, Savelich emailed Christine Marks, a PCLS
employee, a "monitoring protocol" for an Oregon hospital.  Supp.
Field Ex. D.
     On January 15, 2015, there was an email exchange between
Savelich and PCLS employees with the subject line, "Javier
[P]osa Completed an Assessment."  Supp. Field Decl. ¶ 6(d);
Supp. Field Ex. C.  Posa was an Ameritox employee, who, on
February 9, 2015, accepted a position with PCLS.  *See* ECF No.
25-5 at 24; Supp. Field Decl. ¶ 6(e).  Savelich declared that he
had not solicited Posa to work for PCLS; however, the emails
show that Savelich was willing to discuss Posa's application.
Savelich Decl. ¶ 27; Supp. Field Ex. C at 820.
     On January 26, 2015, Savelich received an email asking for
his input on Lito Clemente, apparently one of Ameritox's top
employees.  Supp. Field Ex. C at 842.  Savelich responded that
he would be willing to talk to the PCLS recruiter.  *Id.*
     On February 13, 2015, Savelich emailed a document titled
"Financial AWARE mock-up.JPG" to his PCLS email address.  Supp.

According to Savelich, from December 19, 2014 to the
present, he has not had contact with current or former Ameritox
customers, but has had contact with several Ameritox employees.
ECF No. 25-5 at 22-24.[22]

II.   Analysis

A.   Preliminary Injunction Standard

Preliminary injunctive relief is an "extraordinary remed[y]
involving the exercise of very far-reaching power [and is] to be
granted only sparingly and in limited circumstances."
*MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th
Cir. 2001) (internal quotation marks omitted).  Because such
relief "requires that a district court, acting on an incomplete

---

Field Decl. ¶ 8.  The document replicated Ameritox's Financial
Practice Profile, which is used "to share patient specific
billing summaries for individual customers," but changed the
document label to "PCLS."  Supp. Tully Decl. ¶ 5.  *Compare* Supp.
Field. Ex. A, *with* Supp. Field Ex. E.

On February 17, 2015, Marks emailed Savelich and asked if
he was "the one who gave Robin the intel of IMS payer data?"
Supp. Field Decl. ¶ 9; Supp. Field Ex. F.  That day, Savelich
sent an email to Marks with the subject line, "IMS."  Supp.
Field Decl. ¶ 9; Supp. Field Ex. F.

On February 24, 2015, Marks sent Savelich an email with the
subject line, "Ameritox Best Practice."  Supp. Field Decl. ¶ 10;
Supp. Field Ex. G.  Marks asked Savelich to review her attached
document and let her "know if this is what Ameritox bought"--
apparently in reference to IMS data Ameritox bought and PCLS was
trying to replicate and buy.  Supp. Field Ex. G at 573.

[22] Savelich participated in PCLS's recruitment of Carolyn Furst,
a former Ameritox employee.  Savelich Decl. ¶ 27.  However,
Furst worked for Ameritox before Savelich did, and his
recruitment "was not based on any personal knowledge of [Furst]
gained while employed at Ameritox."  *Id.*

record, order a party to act, or refrain from acting, in a certain way," "[t]he danger of a mistake in this setting is substantial." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (internal quotation marks omitted).

To obtain preliminary injunctive relief, the movant must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent such relief; (3) the balance of equities favors it; and (4) the relief sought is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371 (2010), *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) (per curiam).

    B.    Ameritox's Motion

        1.    Contractual Claims

            a.    Choice of Law

As a preliminary matter, the Court must determine what state's law governs Ameritox's contract claims.  Here, the Agreement contained a choice-of-law provision requiring the application of Maryland law.  *See* Hopkins Ex. 2 ¶ 7.  Under

Maryland law,[23] this Court should presume that a parties' choice of law is enforceable. *See Ground Zero Museum Workshop v. Wilson*, 813 F.Supp.2d 678, 696 (D. Md. 2011); *Henry v. Gateway, Inc.*, 979 A.2d 287, 297 (Md. Ct. Spec. App.2009) ("Maryland appellate courts have long recognized the ability of parties to specify in their contracts which state's law will apply.").

However, Savelich contends that this Court should apply Oregon law to the Agreement because it violated Oregon's statutory notice provision and, thus, is contrary to fundamental Oregon policy. ECF No. 28 at 23; Hr'g Tr at 14-20. Ameritox contends that the nonsolicitation and confidentiality covenants at issue are not subject to Oregon's notice provision. Hr'g Tr. at 3-5.

Section 187 of the Restatement (Second) of Conflict of Laws, to which Maryland subscribes,[24] provides that:

> [t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, *unless* . . . the chosen state *has no substantial relationship* to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

---

[23] A federal court exercising diversity jurisdiction must apply the choice-of-law principles of the state in which the federal court is located. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

[24] *See Kronovet v. Lipchin*, 288 Md. 30, 415 A.2d 1096, 1104-05 (1980).

application of the law of the chosen state would be
*contrary to a fundamental policy* of a state which has
*a materially greater interest* than the chosen state in
the determination of the particular issue....

Restatement (Second) of Conflict of Laws § 187(2)(b)

(1971)(emphasis added); *Ciena Corp. v. Jarrard*, 203 F.3d 312,

323-24 (4th Cir. 2000); *Hunter Grp., Inc. v. Smith*, 9 F. App'x

215 (4th Cir. 2001).[25]

When "the law chosen by the parties would make enforceable

a contract flatly unenforceable in the state whose law would

otherwise apply, to honor the choice-of-law provision would

trench upon that state's fundamental policy." *Barnes Grp., Inc.*

*v. C & C Products, Inc.*, 716 F.2d 1023, 1031 (4th Cir.

1983)(citation and internal quotation marks omitted).

---

[25] At the hearing, Savelich argued that one of the factors courts
consider under Restatement § 187 is "whether that jurisdiction
[Oregon] has the most significant relationship to the
transaction." Hr'g Tr. at 15.  Savelich then asserted that
Oregon has the most significant relationship because its law
would govern absent the choice-of-law provision.  *Id.*  Although
unclear, Savelich may have been arguing that, under Restatement
§ 187, Maryland "has no substantial relationship to the parties
or the transaction."  However, the Fourth Circuit has held that
the state of incorporation has a "substantial relationship" to
the transaction "*even though* [the company's] principal place of
business was" elsewhere.  *See Ciena Corp.*, 203 F.3d at 323-24.
It seems likely, therefore, that when, as here, Ameritox's
principal place of business is in Maryland, ECF No. 1 ¶ 4,
Maryland has a sufficiently "substantial relationship" to the
transaction.  Indeed, under the Fourth Circuit's reasoning in
*Ciena Corp.*, the parties could reasonably have chosen Texas law-
-the state of Ameritox's incorporation--to govern the Agreement.

In the absence of the Agreement's choice-of-law provision, Oregon law would apply.[26]  Under Oregon law, "[a] noncompetition agreement entered into between an employer and employee is voidable and may not be enforced by a court of this state unless . . . [t]he employer informs the employee in a written employment offer received by the employee at least *two weeks* before the first day of the employee's employment that a noncompetition agreement is required as a condition of employment."  Or. Rev. Stat. § 653.295(1)(emphasis added).

A "noncompetition agreement" is defined as:

> an agreement, written or oral, express or implied, between an employer and employee under which the employee agrees that the employee, *either alone or as an employee of another person*, *will not compete with the employer* in providing products, processes or services that are similar to the employer's products, processes or services for a period of time or within a specified geographic area after termination of employment.

§ 653.295(7)(d) (emphasis added).  "[A]n agreement restraining an employee from directly or indirectly soliciting business from *former* clients or *prospective* clients should be construed as a non-competition agreement."  *Naegeli Reporting Corp. v. Petersen*, No. 3:11-1138-HA, 2011 WL 11785484, at *3 (D. Or. Dec.

---

[26] Maryland uses the *lex loci contractus* rule: "the law of the jurisdiction where the contract was made controls its validity and construction."  *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 390, 535 A.2d 466, 467 (1988). Here, the Agreement was made when Savelich signed it in Oregon.  Savelich Decl. ¶ 10. Similarly, Oregon law applies to the HIPAA and Trade Secrets Agreements, and the Offer Letter.

5, 2011) (emphasis added). However, § 653.295(1) does *not* apply to "[a] covenant not to solicit employees of the employer or solicit or transact business with customers of the employer." § 653.295(4). Additionally, the statute does not "restrict[] the right of any person to protect trade secrets or other proprietary information by injunction or any other lawful means under other applicable laws." § 653.295(5).

Here, the Agreement bars Savelich from soliciting "any client of Ameritox." Hopkins Ex. 2 ¶ 2. According to Savelich, that language arguably includes former clients, rendering the covenant a noncompete--and, thus, void--under *Naegeli*. Hr'g Tr. at 20. Ameritox contends that the covenant only covers "existing customers." Hr'g Tr. at 4.

This Court has previously acknowledged the ambiguity of "any." *See Paice LLC, et al. v. The Ford Motor Co.*, Civil Case No. WDQ-14-492, Docket No. 79 (D. Md. Nov. 6, 2014). Here, however, it makes sense to construe "client" as referring to *current* clients; *former* or *prospective* "clients" are not--or are no longer--Ameritox's "clients."[27] Thus, only the noncompete covenant--not the customer or employee nonsolicitation

---

[27] Notably, § 653.295(4), which exempts from subsection (1) "[a] covenant not to . . . or transact business with customers of the employer," is similarly unclear as to whether those customers must be current customers. *Naegeli*, the primary case relied on by Savelich, postdates the covenant at issue. Thus, it seems unfair to hold Ameritox to a greater degree of specificity than the statute itself provided when the covenant was executed.

covenants[28]--is subject to § 653.295(1)'s two week notice provision.[29]  Ameritox is not seeking to enforce the noncompete covenant. *See* ECF Nos. 24; 24-2 at 2; *see also* Hr'g Tr. at 3. Accordingly, the nonsolicitation covenants are not void under Oregon law for lack of two weeks' notice.[30]

Because the provisions at issue are not "contrary to [Oregon's] fundamental policy," the Court need not decide whether Oregon would have a "materially greater interest" than Maryland.  *See* Restatement (Second) of Conflict of Laws § 187(2)(b).  Accordingly, Maryland law applies to the Agreement.[31]

---

[28] *See supra* note 8.

[29] Savelich appears to argue that the Court should not separately interpret the covenants. *See* Hr'g Tr. at 18.  However, under Oregon law, covenants are severable. *Swaggerty v. Petersen*, 280 Or. 739, 746, 572 P.2d 1309, 1314 (1977).

[30] Additionally, § 653.295(1)'s two week notice provision has no bearing on the confidentiality provision.  Hopkins Ex. 2 ¶ 3.

[31] Oregon law governs the HIPAA and Trade Secrets Agreements, and the Offer Letter, because they did not contain a choice-of-law provision and were signed in Oregon.  The Offer letter contains the same covenants as the Agreement. *See supra* note 8.  The Offer Letter also states that it "does not constitute an employment agreement."  Hopkins Ex. 1.  Thus, it is unclear whether Ameritox intended the terms of the Offer Letter to be binding.  Accordingly, Ameritox has not made the requisite "clear showing" on the first element of a breach of contract claim--that there was a contract. *See Real Truth About Obama*, 575 F.3d at 345.

16

b.   Likelihood of Success on the Merits

Ameritox asserts that Savelich breached the Agreement's confidentiality and employee nonsolicitation covenants.   ECF No. 24-1 at 16-17.[32]   Savelich contends that they are unenforceable under Maryland law.   ECF No. 28 at 22.

To enforce a restrictive covenant under Maryland law, "(1) the employer must have a legally protected interest,[33] (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest, (3) the covenant cannot impose an undue hardship on the employee, and (4) the covenant cannot violate public policy." *Deutsche Post Global Mail, Ltd. v. Conrad*, 116 F. App'x 435, 438 (4th Cir. 2004) (*citing Silver v. Goldberger*, 231 Md. 1, 6-8, 188 A.2d 155, 158-59 (Md. 1963)).   Savelich contends that the

---

[32] The complaint alleges that Savelich breached the Agreement's confidentiality covenant; Ameritox has not alleged--though it now asserts--that Savelich breached the employee nonsolicitation covenant.   *See* ECF No. 1 ¶¶ 37-38.   Ameritox does not appear to contend that Savelich has breached the customer nonsolicitation covenant, but argues that it would likely succeed on the merits of enforcing that covenant.   ECF No. 24-1 at 17-20.   Although the text of Ameritox's argument includes the assertion that Savelich "breached the non-solicitation provision of the Agreement," *id.* at 17, the argument's sub-heading, text, and concluding sentence are directed at enforcement, not showing breach, *id.* at 17-20.

[33] "Restrictive covenants almost always serve a legitimate employer interest when they restrict former salespersons who serviced, solicited, and were in constant contact with customers." *Deutsche Post*, 116 F. App'x at 438 (*citing Silver*, 231 Md. at 6, 188 A.2d at 188).

covenants exceed the scope reasonably necessary to protect Ameritox's interests.   ECF No. 28 at 27-31; Hr'g Tr. at 22.

i.      Nonsolicitation Covenants

Savelich contends that the customer nonsolicitation covenant is overbroad as to "soliciting, urging, and inducing 'clients.'"  ECF No. 28 at 27.  Savelich argues that the covenant includes those who first become clients during the one-year post-termination period, with whom Savelich has had no prior contact, and includes clients in at least one state (Oklahoma) where Savelich never provided services.  *Id.* at 27. Savelich further argues that "client" is temporally vague.  *Id.* Ameritox argues that the customer nonsolicitation covenant is not overbroad because it is limited to "existing customers and only customers that were in [Savelich's] districts."  Hr'g Tr. at 4.

Under the customer nonsolicitation covenant, Savelich may not:

> directly or indirectly solicit, entice or induce any
> client of Ameritox within the states of AZ, CA, CO,
> ID, MI, NM, NV, OK, OR, TX, UT, WA, WY which are
> states within my purview . . . , to become a client,
> customer, distributor, licensor, licensee or reseller
> of any other person, firm or corporation other than
> Ameritox with respect to products and/or services then
> sold or under development by Ameritox or to reduce or
> cease doing business with Ameritox.

Hopkins Ex. 2 ¶ 2.

Maryland has enforced restrictive covenants barring solicitation of all of an employer's clients. *See Fowler v. Printers II, Inc.*, 89 Md. App. 448, 465, 598 A.2d 794, 802 (1991) (noting that Maryland courts have enforced non-compete agreements barring solicitation of "all customers" of a former employer, not just those with whom the former employee had worked); *Tuttle v. Riggs-Warfield-Roloson, Inc.*, 251 Md. 45, 47, 246 A.2d 588, 589 (1968) (upholding covenant barring the former employee, for two years, from "engaging either directly or indirectly . . . with [the employer's] customers"). When the scope of the covenant is facially reasonable, the court will examine the facts and circumstances of the individual case. *See Millward v. Gerstung Int'l Sport Ed., Inc.*, 268 Md. 483, 487, 302 A.2d 14, 16 (1973).

Here, the customer nonsolicitation covenant bars Savelich from soliciting any client in two states--Oklahoma and Nevada--where Savelich never provided services. *See* Tully Decl. ¶ 21; Hopkins Ex. 2 ¶ 2.[34]  Though the covenant does not extend to *all* of Ameritox's nationwide customers, it does extend further than is necessary to protect Ameritox's interest in preventing Savelich from using the goodwill generated during his employment with Ameritox. *See Deutsche Post Global Mail, Ltd. v. Conrad*,

_____

[34] At the hearing, Ameritox did not address this discrepancy, which was raised in Savelich's opposition. *See* ECF No. 28 at 27.

292 F. Supp. 2d 748, 755 (D. Md. 2003) *aff'd on other grounds*, 116 F. App'x 435 (4th Cir. 2004)(declining to enforce nonsolicitation of all clients when former employer had a global client base, and employees "developed comparatively few customer relationships in the limited area of Maryland, Virginia, and Washington, D.C."); *Holloway v. Faw, Casson & Co.*, 78 Md. App. 205, 222, 552 A.2d 1311, 1319 (1989) *aff'd in part, rev'd in part*, 319 Md. 324, 572 A.2d 510 (1990) (finding unreasonable in scope a customer nonsolicitation provision that barred employee from engaging with former employer's clients with which employee had no dealings).

"If a restrictive covenant is unnecessarily broad, a court may blue pencil or excise language to reduce the covenant's reach to reasonable limits." *Deutsche Post*, 116 F. Appx. at 439 (*citing Tawney*, 47 A.2d at 379; *Fowler*, 598 A.2d at 802). However, "[a] court [may] only blue pencil a restrictive covenant if the offending provision is neatly severable." *Id.* Although "offending provision[s]" may be stricken, *see id.*, "Maryland courts have excised restrictions that render a covenant overbroad only in circumstances in which the restrictions are contained in a separate clause or separate sentence." *See id.* (declining to strike "the dominant language

or words from a single-sentence restrictive covenant, leaving only a narrower example of the original, broader restriction").[35]

Accordingly, the customer nonsolicitation covenant is overly broad, and Ameritox has not shown that it is likely to succeed on the merits in enforcing it.

Savelich also contends that the employee nonsolicitation covenant is overly broad because it applies to "any employee at any level in any location." *Id.* at 30. Ameritox argues that the employee nonsolicitation covenant is "narrowly tailored to . . . current employees or employees who have left within the last six months." Hr'g Tr. at 5.

That covenant bars Savelich from "directly or indirectly solicit[ing], recruit[ing] or hir[ing] *any employee* of Ameritox . . . to work for a third party other than Ameritox or engage in any activity that would cause any employee to violate any agreement with Ameritox." Hopkins Ex. 2 ¶ 2 (emphasis added).

---

[35] *Cf. SNS One, Inc. v. Hage*, No. CIV. L-10-1592, 2011 WL 2746713, at *2 (D. Md. July 11, 2011). In *Hage*, the district court struck offending clauses in an overly broad covenant:

> During [Hage]'s employment by [SNS One] and for a period of (1) one year after [Hage] ceases to be employed by [SNS One], [Hage] shall not within (1) year directly or indirectly ... be employed by, connected with, participate in, consult or otherwise associate with any other business, enterprise, or venture that is ~~the same as, similar to or~~ competitive with [SNS One].

*Id.* at *2 (alterations in original). The Court then decided that the amended covenant was unenforceable because the plaintiff had been unable to identify its competitors. *Id.* at *4.

"[T]o be enforceable, restrictive covenants must be specifically targeted at preventing former employees from trading on the goodwill they generated during their former employment." *Allegis Grp., Inc. v. Jordan*, Civil No. GLR-12-2535, 2014 WL 2612604, at *9 (D. Md. June 10, 2014)(*citing Deutsche Post*, 116 F. App'x at 439; *MCS Services, Inc. v. Jones*, No. WMN-10-1042, 2010 WL 3895380, at *3 (D.Md. Oct. 1, 2010)).

By barring Savelich from soliciting *any* Ameritox employees, the covenant is not narrowly tailored to preventing Savelich from trading on his goodwill.  At the hearing, Ameritox did not argue that the covenant was limited to employees with whom Savelich had worked; indeed, Ameritox affirmed that it covered "any current employees."  *See* Hr'g Tr. at 5-6, 37.  Accordingly, the employee nonsolicitation covenant is overly broad, and Ameritox has not shown that it will succeed in its enforcement. *See Jordan*, 2014 WL 2612604 at *9 (declining to enforce an employee nonsolicitation provision when the employer had not shown that the employee worked or interacted with those encompassed by the provision).[36]

---

[36] As Ameritox has not alleged that Savelich breached the employee nonsolicitation covenant, the Court need not consider whether it would succeed on the merits of that (nonexistent) claim.  *See* ECF No. 1 ¶¶ 37-38 (alleging that Savelich violated his agreements by emailing confidential information).

ii.   Confidentiality Covenant

Savelich contends that the confidentiality covenant is overly broad because it includes information generally known in the industry, and is impermissibly vague.  ECF No. 28 at 31.

The confidentiality covenant bars Savelich from using, removing, or disclosing "Confidential Information," including "without limitation, information and knowledge pertaining to services offered, innovations, ideas, plans, trade secrets, proprietary information, marketing and sales methods and systems, sales and profit figures, customer and client lists, Ameritox employee lists, and relationships between Ameritox and its affiliates and other customers, clients, suppliers, and others. . . ."  Hopkins Ex. 2 ¶ 3.

Maryland recognizes "that restrictive covenants may be applied" to protect against "the future misuse of trade secrets, routes or lists of clients, or solicitation of customers." *Becker v. Bailey*, 268 Md. 93, 97, 299 A.2d 835, 838 (1973). However, under Maryland law, "questions arise as to the enforceability of the Confidentiality Provisions by virtue of their having wider breadth than the [Maryland Uniform Trade Secrets Act ("MUTSA")]." *Structural Pres. Sys., LLC v. Andrews*, No. CIV.A. MJG-12-1850, 2013 WL 3820023, at *4 (D. Md. July 23, 2013)(*citing Fowler*, 598 A.2d at 794).

23

The MUTSA protects "information, including a drawing, cost data, customer list, formula, pattern, compilation, program, device, method, technique or process that . . . [d]erives independent economic value, actual or potential, from not being generally known . . . and . . . [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Md. Code Ann., Com. Law § 11-1201(e).

Although certain enumerated items of Ameritox's "Confidential Information" are encompassed by the MUTSA, some of it arguably extends, in some ill-defined fashion, beyond the MUTSA's scope; for example, knowledge or information about mere services offered by Ameritox, its ideas, and plans, and, potentially, its marketing and sales methods (to the extent those are in the public domain).  As Savelich asserts, some of that knowledge is generally known in the industry, or within his general knowledge.  ECF No. 28 at 31; *see U.S. Foodservice, Inc. v. Marzich*, Civil Case No. 06-0007 (N.D. Ill. Sept. 2, 2008)(applying Maryland law to hold unenforceable an "overly ambitious" confidentiality provision that extended beyond what was reasonably necessary to protect business interests and presented an undue burden on the employee);[37] *Hage*, 2011 WL

---

[37] There,

> the definition of "Confidential Information" include[d], but [was] not limited to, the "names, job titles and telephone numbers of the principal

2746713, at *2 ("An employee needs firm, solid guidance on what he can and cannot do if he leaves his employer.").

Accordingly, the confidentiality covenant is overly broad, and Ameritox has not shown that it is likely to succeed on the merits of its enforcement.[38]

### 2.   Misappropriation of Trade Secrets

#### a.   Likelihood of Success

Under Oregon's and Maryland's Uniform Trade Secrets Law,[39] "trade secret" means

---

> contact(s) of each Customer," "Customer lists or other documents containing identity information," as well as "information pertaining to the Company's methods of operation, process, strategies and techniques, including strategies for identifying and satisfying the needs of specific Customers and types of Customers; information relating to employees of the Company, including but not limited to employees' identities, home and business telephone and pager numbers, and addresses, customers served by other employees, and performance characteristics of employees."

*Marzich*, Civil Case No. 06-0007 at 22-23.

[38] The Trade Secrets Agreement does not define the scope of the "confidential information" of which it bars disclosure.  Hopkins Ex. 3 at 1.  The HIPAA Agreement broadly defines "confidential information" as including, but not limited to, "[protected health information], financial information, business data or information, customer information, reports, pricing information, projections, employee lists and personnel information, records, notes, analyses, studies[,] *or other information related in any manner* to the operations of the Company."  Hopkins Ex. 4 at 1 (emphasis added).  They are similarly overly broad and vague. *See Hage*, 2011 WL 2746713, at *2.  Whether Savelich disclosed Trade Secrets will be considered in light of Ameritox's statutory misappropriation claim. *See infra* II.B.2.

information, including a drawing, cost data, customer
list, formula, pattern, compilation, program, device,
method, technique or process that:

(a) Derives independent economic value, actual or
potential, from not being generally known to the
public or to other persons who can obtain economic
value from its disclosure or use; and (b) Is the
subject of efforts that are reasonable under the
circumstances to maintain its secrecy.

Or. Rev. Stat. § 646.461(4); Md. Code Ann., Com. Law § 11-
1201(e).

Ameritox asserts that the information Savelich emailed to
his personal email account "constitutes trade secrets under
Maryland and Oregon law." ECF No. 24-1 at 20; *see also* ECF No.
1 ¶ 51. Ameritox further asserts that Savelich is "using the
knowledge and information . . . to assist PCLS in developing and
replicating Ameritox's processes." *Id.* Savelich contends that
"[t]here is no factual support to show a likelihood of success"
on this claim. ECF No. 28 at 34.

Savelich appears to concede that IMS health provider
information, spreadsheets containing customer information, and
customer data from Ameritox's TMT interface are Ameritox trade
secrets. *See* ECF No. 28 at 34 (*citing* Tully Decl. ¶¶ 9-12 as
"the only nonconclusory factual support" for Ameritox's
information qualifying as trade secrets). Savelich asserts that

---

[39] Ameritox has pled its misappropriation claim under Maryland
and Oregon law. *See* ECF No. 1 at 9.

Ameritox has not shown that any other "broader category of information" constitutes trade secrets. *Id.*

Courts have deemed customer information trade secrets when an employer has invested time and resources in its development. *See NaturaLawn of Am., Inc. v. W. Grp., LLC*, 484 F. Supp. 2d 392, 399 (D. Md. 2007); *Padco Advisors, Inc. v. Omdahl*, 179 F.Supp.2d 600 (D. Md. 2002); *Dial Temp. Help Serv., Inc. v. Shrock*, 946 F. Supp. 847, 854 (D. Or. 1996).

Here, Ameritox bought its IMS health provider directory and "spent considerable resources" developing a proprietary tool—TMT—to utilize its customer data.  Tully Decl. ¶¶ 10-11. Ameritox took steps to maintain its secrecy by storing the IMS directory on its network and requiring a password to access the data.  Hr'g Tr. at 6.  Ameritox's customer data is a trade secret.

Courts are divided, however, on whether financial or pricing information is a trade secret. *Compare Optic Graphics, Inc. v. Agee*, 87 Md. App. 770, 591 A.2d 578, cert. denied, 324 Md. 658, 598 A.2d 465 (1991) (pricing information was not a trade secret), *with LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 309-10, 849 A.2d 451, 463-64 (2004) (cost and profit information was a trade secret).  Crucial to the analysis is the extent to which the company seeking to protect the data has shown that it "[d]erives independent economic value . . . from

27

not being generally known to the public or to other persons who
can obtain economic value from its disclosure or use." *See
Montgomery County Ass'n of Realtors, Inc. v. Realty Photo Master
Corp.*, 878 F. Supp. 804, 814 (D. Md. 1995), *aff'd*, 91 F.3d 132
(4th Cir. 1996) (holding that a realtor association's database
was not a "trade secret" because it had been "distributed widely
to its realtor members and potential purchasers"); *Optic
Graphics*, 591 A.2d at 587 (pricing information and market
strategy were not trade secrets when plaintiff had not shown
that it derived economic value from them).

Here, Ameritox asserts--in a conclusionary fashion--that
"confidential pricing information" is a trade secret.  ECF No.
24-1 at 20.  However, it has not explained how it derives
economic value from the information.  Accordingly, Ameritox has
shown that its customer information--but not any other
information--is a trade secret.

"Misappropriation" of a trade secret includes improper
acquisition, "[d]isclosure or use of a trade secret . . .
without express or implied consent by a person who . . . [a]t
the time of disclosure or use, knew or had reason to know that
the person's knowledge of the trade secret was . . . [a]cquired
under circumstances giving rise to a duty to maintain its
secrecy or limit its use; or . . . [d]erived from or through a

person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." § 646.461(2); § 11-1201(c).

Ameritox asserts that Savelich has used (or intends to use) its customer information "to assist PCLS in developing business and replicating Ameritox's processes." ECF No. 24-1 at 20; *see also* ECF No. 1 ¶ 55. Emails provided by Ameritox appear to show Savelich and Marks (from PCLS) using Ameritox's IMS data to help PCLS build its own database. Supp. Field Decl. ¶ 10; Supp. Field Ex.'s F, G. Accordingly, Ameritox has shown that Savelich misappropriated its protected IMS trade secret information.

b.   Irreparable Harm

Although irreparable harm may be found when "the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill," *see Gen. Parts Distribution, LLC v. St. Clair*, No. 11-CV-03556-JFM, 2011 WL 6296746, at *6 (D. Md. Dec. 14, 2011), "harm is not 'irreparable' if it can be compensated by money damages." *Pers. v. Mayor & City Council of Baltimore*, 437 F. Supp. 2d 476, 479 (D. Md. 2006).

As to Savelich's misappropriation of customer information (which, as explained above, is the only claim the Court has found Ameritox likely to succeed on), Ameritox has not shown that irreparable harm is likely or that monetary damages are insufficient. The emails Ameritox provided merely show that

29

PCLS is attempting to replicate the manner in which Ameritox buys and organizes its customer information. Supp. Field Decl. ¶ 9; Supp. Field Ex. F.  Ameritox has not shown that it is losing, or imminently will lose, customers.

Ameritox relies on *Bowe Bell & Howell Co. v. Harris*, 145 F. App'x 401, 403 (4th Cir. 2005), where the Fourth Circuit affirmed a preliminary injunction when one defendant emailed a customer list to another defendant, thus likely misappropriating a trade secret, to support the proposition that it is likely to suffer irreparable harm.  There, however, the Fourth Circuit balanced the respective harms under the *Blackwelder* test that is no longer used in this Circuit.  *See id.*  Moreover, the Fourth Circuit found that the balance of hardships favored the injunction "because the evidence demonstrated a likelihood of success on the merits . . . [that] could not be compensated by money damages alone."  *Id.* at 403-04.  Under current law, the Court must find irreparable harm distinct from the likelihood of success on the merits.  *See Real Truth About Obama,* 575 F.3d at 346.  As stated above, Ameritox has not shown the inadequacy of money damages for the misappropriation at issue.[40]

---

[40] When this Court granted Ameritox the TRO, it found irreparable harm in connection with Savelich's alleged breach of the customer nonsolicitation provision.  *See* ECF No. 17 at 8.  With the benefit of additional briefing and argument, the Court finds that covenant unenforceable.

Additionally, in compliance with the TRO, Savelich has, or will, return documents containing confidential and proprietary information and trade secrets to Ameritox, and all such data will be erased from Savelich's email accounts and computing devices. *See supra* note 19.   Although Ameritox contends an injunction is proper because information that Savelich misappropriated "likely resides in his head--he cannot simply pretend it does not exist," ECF No. 24-1 at 15, "absent a special and enforceable duty, an alert salesperson is not required to undergo a prefrontal lobotomy," *Amex Distrib. Co. v. Mascari*, 150 Ariz. 510, 517, 724 P.2d 596, 603 (Ct. App. 1986). Moreover, Maryland does not recognize the doctrine of "inevitable disclosure" that would support an injunction to prevent "threatened future disclosure or use of a trade secret."[41]

---

[41] *LeJeune, Inc.*, 849 A.2d at 467, 471 (noting that "[n]o [Maryland] court interpreting the provisions of MUTSA has applied the theory of inevitable disclosure," and that the doctrine "remains the subject of considerable disagreement" in other courts applying the Uniform Trade Secrets Act)(internal quotation marks and citation omitted). *LeJeune, Inc.* declined to adopt the doctrine of inevitable disclosure in part, because of Maryland "policy in favor of employee mobility," 849 A.2d at 471.   The Court has not been able to locate--nor has Ameritox provided--authority for the proposition that Oregon has adopted the inevitable disclosure doctrine for the purpose of issuing a preliminary injunction.   One commentator has observed that "[i]f Oregon adopted the inevitable disclosure doctrine, Oregon employees could be subject to the equivalent of [a noncompete agreement] without any notice of the restriction or consideration in exchange," which "would be directly counter to

Accordingly, Ameritos has not made a "clear showing" of irreparable harm arising from Savelich's misappropriation of customer data. *See Real Truth About Obama*, 575 F.3d at 345.

     3.   Duty of Loyalty

"Employees have a duty of loyalty to the employer." *Institutional Mgmt. Corp. v. Translation Sys., Inc.*, 456 F. Supp. 661, 670 (D. Md. 1978). "The misuse of confidential information [may] constitute a breach of [the duty of loyalty]." *Fundamental Admin. Servs., LLC v. Anderson*, No. CIV. JKB-13-1708, 2014 WL 5797125, at *3 (D. Md. Nov. 6, 2014)(*citing Dworkin v. Blumenthal*, 551 A.2d 947, 949 (Md. Ct. Spec. App.1989)). However, the MUTSA is the "exclusive remedy for civil claims based on misappropriation of trade secrets," and, thus, "preempts at least some common law claims for breach of fiduciary duty." *Allstate Ins. Co. v. Warns*, No. CIV. CCB-11-1846, 2012 WL 681792, at *8 (D. Md. Feb. 29, 2012); Com. Law § 11-1207(a). Accordingly, the Court need not address whether Ameritox is entitled to an injunction under a theory of breach of duty of loyalty apart from its analysis of whether Ameritox is entitled to an injunction based on statutory misappropriation.

---

the legislature's intent" when it enacted "one of the most detailed noncompetition statutes of any state." Shannon Aaron, *Using the History of Noncompetition Agreements to Guide the Future of the Inevitable Disclosure Doctrine*, 17 Lewis & Clark L. Rev. 1191, 1216-17 (2013).

III. Conclusion

For the reasons stated above, Ameritox's motion for a preliminary injunction will be denied.

_____3/11/15_____
Date

William D. Quarles, Jr.
United States District Judge